MARY C. WESTPHAL, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ESTATE OF WILLIAM R. WESTPHAL, DECEASED, MARY C. WESTPHAL AND FIRST NATIONAL BANK OF MINNEAPOLIS, COEXECUTORS, AND MARY C. WESTPHAL, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 79677, 79678.   Filed November 28, 1961.

*William B. McCallum, Esq.*, for the petitioners.
*John M. Byers, Esq.*, for the respondent.

TRAIN, *Judge:* Respondent has determined deficiencies in petitioners' income taxes for 1956 and 1957 in the respective amounts of $10,785.34 and $2,895.43.

The issues presented in this case are:

(1) Whether certain payments to Mary C. Westphal in 1956 and 1957 by a corporation, of which her husband was president prior to his death on June 21, 1956, constitute taxable income to her; and

(2) Whether the excess of deductions over gross income on the income tax return for the estate of William R. Westphal for the taxable year June 22—December 24, 1956, are deductible by the beneficiary in 1956.

The medical expense deduction allowable for each year involves only a mathematical computation which will depend on our determinations with respect to the two controverted issues.

### FINDINGS OF FACT.

Many of the facts were stipulated and are hereby found as stipulated.

Petitioners are the Estate of William R. Westphal, deceased, Mary C. Westphal and First National Bank of Minneapolis, coexecutors, and Mary C. Westphal (hereinafter sometimes referred to as Mary). William R. Westphal will hereinafter sometimes be referred to as decedent. His estate will hereinafter sometimes be referred to as the estate.

Decedent died on June 21, 1956, and was survived by Mary, his widow.

Petitioners' income tax returns for the taxable years 1956 and 1957 were filed with the district director of internal revenue for the district of Minnesota.

At the time of his death, decedent was president of the Flour City Ornamental Iron Company (hereinafter sometimes referred to as Company), Minneapolis, Minnesota. He had been employed by Company since 1909. He served as its president from 1952 until his death, at which time he was receiving a salary of $50,000 per year. At the time of his death decedent owned 4,570 shares of common stock of Company and Mary owned 1,500 shares. The total number of shares outstanding at that date was 370,000.

The net income after taxes of Company was as follows:

| | |
|---|---|
| 1953 | $308,228.58 |
| 1954 | 668,120.52 |
| 1955 | 602,056.67 |
| 1956 | 517,650.27 |
| 1957 | 702,180.18 |
| 1958 | 94,608.61 |

From 1940 to 1956, inclusive, decedent's salary from Company was as follows:

| | | | |
|---|---|---|---|
| 1940 | $10,400.00 | 1949 | $35,000.00 |
| 1941 | 29,500.00 | 1950 | 38,500.00 |
| 1942 | 29,500.00 | 1951 | 38,500.00 |
| 1943 | 29,500.00 | 1952 | 38,500.00 |
| 1944 | 29,500.00 | 1953 | 42,000.00 |
| 1945 | 29,500.00 | 1954 | 45,000.00 |
| 1946 | 29,500.00 | 1955 | 50,000.00 |
| 1947 | 25,000.00 | 1956 | 50,000.00 |
| 1948 | 29,166.67 | | |

On June 28, 1956, Company's board of directors adopted two resolutions concerning decedent. The first of these resolutions was in the nature of a eulogy. The second resolution is described in the minutes of the meeting as follows: "The Board of Directors also adopted a resolution to continue the salary of William R. Westphal through the calendar year 1956."

The next day, Henry J. Neils, the new president of Company, wrote to Mary that "The Board also adopted a resolution that recognizes the continuing value of [decedent's] services, and has resolved to continue the monthly salary payments through December of this year. These checks will be made to you or to Bill's Estate as may be determined to be in the best interests of the Company and yourself." The payments were made to Mary rather than to the estate as a matter of convenience to both parties.

Before determining to whom the payments would be made, company officials wanted to be sure the payments would constitute a salary deduction to Company.

Pursuant to the resolution of June 28, 1956, Mary received payments totaling $25,000 in 1956. This resolution was adopted in recognition of the continuing value of decedent's services to Company and not because of any sympathy, kindness, or generosity toward Mary by the board of directors, or because of need on the part of Mary.

On February 12, 1957, the board of directors of Company adopted a resolution authorizing "payment of Mr. William R. Westphal's salary to his widow for an additional six months at one-half the former rate, or a total of $12,500.00." The purposes and intentions of the board of directors in adopting that resolution were the same as those which prompted the resolution of June 28, 1956, continuing decedent's salary.

The first check received by Mary pursuant to the resolution of February 12, 1957, was returned by her to Company since she believed her husband's full salary should have been continued for 1 year. On April 17, 1957, Mary attended a meeting of Company's board of directors and requested it to change the resolution of February 12, 1957, to provide that decedent's full salary would be continued for an additional 6 months. As a basis for this request Mary stressed the loyalty, devotion, and service decedent had rendered to Company. At that meeting, the board of directors affirmed its resolution of February 12, 1957, continuing the salary of decedent for 6 months at one-half the former rate.

As a result of the resolutions of February 12, 1957, and April 17, 1957, Mary received payments totaling $12,500 in 1957.

All of the payments to Mary were entered on the books of Company as salary and were deducted as such on its Federal income tax returns.

The resolutions continuing decedent's salary would not have been adopted except for the position he held and the services he rendered to Company. At least a few of the directors had never met Mary prior to the April 17 meeting and had no knowledge of Mary's financial needs. The payments received by Mary pursuant to the above-mentioned resolutions of June 28, 1956, February 12, 1957, and April 17, 1957, did not proceed from a donative intent toward her by Company.

The Order Allowing Final Account and the Decree of Distribution in the estate by the Probate Court, Hennepin County, Minnesota, are dated December 24, 1956.

The only U.S. Fiduciary Income Tax Return for the estate covered the period from June 22, 1956, to December 24, 1956, and was filed with the district director of internal revenue for the district of Minnesota on April 15, 1957. This return showed an excess of deductions over total income in the amount of $4,463.43, which is accepted by the parties as being correct.

The excess deductions shown on the U.S. Fiduciary Income Tax Re-

turn were claimed as a deduction in the joint income tax return of decedent and Mary for the calendar year 1956.

The decree of distribution provides that the listed personal property and real estate "hereby is assigned to and vested in" Mary.

It is stipulated that the assets of the estate had not been distributed, nor had the executors been discharged, as of December 31, 1956.

During the year 1957, the coexecutors held assests of the estate either in their name or in the name of decedent; received dividends on stock held in their name or in the name of decedent; received interest on United States Savings Bonds held in their name; and made disbursements in their names.

The Receipt of Residuary Legatee (Mary) acknowledging receipt of the assets assigned to her under the will of decedent, was signed by her on December 27, 1957. The bulk of the assets of the estate was transferred from the estate to Mary at the time this receipt was signed.

Some of the assets of the estate to which Mary was entitled under the will and the decree of distribution were not transferred from the estate to her until 1958.

## Opinion.

### Issue 1.

Petitioners contend that the money Mary received from Company after decedent's death in 1956 is a "gift" and therefore excludible from income under section 102(a) [1] of the 1954 Code.[2] Mary makes the same contention as to the amounts she received from Company in 1957. Respondent maintains that these sums are not gifts and has included in petitioners' income for 1956 the amounts received by Mary in 1956 after excluding therefrom $5,000 pursuant to the pertinent provisions of section 101.[3] Respondent included in Mary's income for 1957 the amount she received in 1957. Respondent maintained, in the alternative, that even if the payments constituted a gift they were includible in income to the extent they exceeded $5,000. However, respondent specifically abandoned this contention on brief.

We agree with respondent's primary position.

---

[1] SEC. 102.  GIFTS AND INHERITANCES.

(a) GENERAL RULE.—Gross income does not include the value of property acquired by gift, bequest, devise, or inheritance.

[2] All statutory references are to the Internal Revenue Code of 1954 unless noted otherwise.

SEC. 101.  CERTAIN DEATH BENEFITS.

(b) EMPLOYEES' DEATH BENEFITS.—

(1) GENERAL RULE.—Gross income does not include amounts received (whether in a single sum or otherwise) by the beneficiaries or the estate of an employee, if such amounts are paid by or on behalf of an employer and are paid by reason of the death of the employee.

(2) SPECIAL RULES FOR PARAGRAPH (1).—

(A) $5,000 LIMITATION.—The aggregate amounts excludable under paragraph (1) with respect to the death of any employee shall not exceed $5,000.

This case is governed by our decision in *Estate of Mervin G. Pierpont*, 35 T.C. 65 (1960), on appeal (C.A. 4). See *Commissioner* v. *Duberstein*, 363 U.S. 278 (1960).

The detailed findings need not be set forth again. The payments in question were in recognition of decedent's services to Company and were not intended by Company as gifts to Mary.

On this issue we hold for respondent.

## *Issue 2.*

Petitioners contend [4] that the estate terminated on December 24, 1956, and that during its last and only taxable year, June 22—December 24, 1956, the estate had deductions in excess of gross income. Under section 642(h) [5] this excess is deductible by Mary, the sole beneficiary of the estate. Respondent concedes that Mary is the sole beneficiary of the estate and that the estate did have an excess of deductions over income during the taxable year, June 22—December 24, 1956. However, respondent maintains the estate did not terminate during 1956 (the year in which Mary took the deduction) and that the taxable year during which the excess of deductions over income was incurred was not the last taxable year of the estate.

We agree with respondent.

Section 642(h) was first enacted in 1954. There was no comparable provision in the 1939 Code. It does not appear that any reported case has interpreted the provisions of this subsection. See *Mellott* v. *United States*, 257 F.2d 798, 803 (C.A. 3, 1958), affirming 156 F.Supp. 253, 256 (E.D. Pa. 1957).

The terms "termination of estate" and "last taxable year" are not defined in the Code.[6] The committee reports [7] do not discuss the meaning to be given to these terms. However, the question of whether an estate remains in existence so that income may be taxable to it under

---

[4] We gather this argument from the pleadings and the opening remarks at the hearing although petitioners have not submitted a brief on this issue.

[5] SEC. 642. SPECIAL RULES FOR CREDITS AND DEDUCTIONS.

(h) UNUSED LOSS CARRYOVERS AND EXCESS DEDUCTIONS ON TERMINATION AVAILABLE TO BENEFICIARIES.—If on the termination of an estate or trust, the estate or trust has—

(1) a net operating loss carryover under section 172 or a capital loss carryover under section 1212, or

(2) for the last taxable year of the estate or trust deductions (other than the deductions allowed under subsections (b) or (c)) in excess of gross income for such year, then such carryover or such excess shall be allowed as a deduction, in accordance with regulations prescribed by the Secretary or his delegate, to the beneficiaries succeeding to the property of the estate or trust.

[6] See sections 441(b) and 7701(a)'(23) for definitions of taxable year.

[7] H. Rept. No. 1337, 83d Cong., 2d Sess., pp. 62, A201 (1954) ; S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 83, 343 (1954). Note that the House version of the bill included this matter at section 662(d). The Senate version, which was accepted, was not significantly different from the House version. Conference Rept., H. Rept. No. 2543, 83d Cong., 2d Sess., p. 54 (1954).

section 641[8] and its predecessors logically involves the same concepts of termination and taxable year. It may fairly be postulated that:

If an entity still exists for tax purposes, then it has not yet been terminated for tax purposes;

If an entity must file a return for a period subsequent to that covered by its last previous return, then the period covered by that last previous return was not the entity's last taxable year.[9]

The committee reports treated the problem of period of administration of an estate in identical language:[10]

The determination of whether a trust has terminated so that the provisions of this subchapter no longer apply depends upon whether the property held in trust has been distributed to the persons entitled to succeed to the property upon termination of the trust rather than upon the technicality of whether or not the trustee has rendered his final accounting. In the case of estates, the period of administration or settlement is the period actually required by the administrator or executor to perform the ordinary duties of administration, such as the collection of assets and the payment of debts, legacies, and bequests, whether this period is longer or shorter than the period specified under local law for the settlement of estates. Thus, where an executor, who is also named as trustee under the will, fails to obtain his discharge as executor, the period of administration only continues until the time the duties of administration are complete and he actually assumes his duties as trustee, whether or not pursuant to a court order. * * *[11]

It is stipulated that "All of the assets of the Estate had not been distributed, nor had the executors been discharged, as of December 31, 1956." The bank account maintained by the executors for the estate in the First National Bank of Minneapolis shows disbursements during 1957 totaling $3,851.64, primarily for inheritance and income taxes. The executors deposited in the account interest and dividend income totaling $2,121. United States Series E bonds and cash were transferred to Mary in December 1957. Other bonds and Company stock were transferred to her in January 1958.

---

[8] SEC. 641. IMPOSITION OF TAX.

(a) APPLICATION OF TAX.—The taxes imposed by this chapter on individuals shall apply to the taxable income of estates or of any kind of property held in trust, including—

\* \* \* \* \* \* \*

(3) income received by estates of deceased persons during the period of administration or settlement of the estate; * * *

[9] See *Commissioner* v. *Lester,* 366 U.S. 299, 304 (1961), where the Supreme Court iterated a general rule of construction applicable here: "And, as we have frequently stated, the Code must be given 'as great an internal symmetry and consistency as its words permit.' *United States* v. *Olympic Radio & Television,* 349 U.S. 232, 236 (1955)."

[10] H. Rept. No. 1337, *supra* at A191–A192; S. Rept. No. 1622, *supra* at 340. The Ways and Means Committee version of section 641 was adopted in toto.

[11] We note that respondent's regulations interpreting the phrase "the period of administration or settlement of the estate" in both section 641(a)(3) of the 1954 Code and section 161(a)(3) of the 1939 Code are substantially the same as the above-noted language of the committee reports. Sec. 1.641(b)-3, Income Tax Regs.; sec. 39.162–1(g), Regs. 118. The 1939 Code regulation was specifically approved by this Court in *Marin Caratan,* 14 T.C. 934 (1950).

We conclude that, in the language of the committee reports, the "period actually required by the * * * executor to perform the ordinary duties of administration, such as the collection of assets and the payment of debts, legacies, and bequests" had not yet terminated by December 31, 1956.

This Court has held that, where administration of an estate is unduly prolonged, the estate will be treated as having terminated and its income will be taxed to the beneficiaries. E.g., *Marin Caratan*, 14 T.C. 934 (1950) (decedent died September 13, 1939; final account filed October 3, 1946; found, estate terminated August 31, 1941); *Joseph M. Roebling*, 18 T.C. 788 (1952) (decedent died May 29, 1936; final account not yet filed by 1948; found, estate terminated prior to 1941). We have not been shown that the administration of this estate, insofar as it continued after December 31, 1956, was unduly prolonged.[12] We conclude that the taxable year for which the estate reported the loss here sought to be taken by petitioners was not the "last taxable year" of the estate and that the estate had not terminated as of December 31, 1956.

The Code does not clearly indicate when the section 642(h) deductions are to be taken by the beneficiaries. Respondent's regulation (sec. 1.642(h)–2(a), Income Tax Regs.), specifically authorized by section 642(h), requires such deductions to be taken "only in the taxable year of the beneficiary in which or with which the estate or trust terminates, whether the year of termination of the estate or trust is of normal duration or is a short taxable year." We find no conflict between the regulation and the statute.

We have not been shown that any other taxable year of the estate was its last taxable year nor have we been shown what, if any, excess of deductions over income had been incurred by the estate for its last taxable year.

On this issue we hold for respondent.

Since all adjustments made by respondent with respect to petitioners' income for the years before the Court have been upheld, it is not necessary to recompute the amount of medical expense deductions to be disallowed.

*Decisions will be entered for the respondent.*

---

[12] See Minn. Stat. Ann., sec. 525.47 :

525.47 Duration of administration

Every executor, general administrator, or administrator with the will annexed shall have one year from the date of his appointment for the settlement of the estate. A special administrator or an administrator de bonis non shall have such time not exceeding one year as the court may determine. For cause shown the period herein limited may be extended by the court, not exceeding one year at a time. The representative shall not be disqualified thereafter in any way, unless removed ; but he shall not be relieved from any loss, liability, or penalty incurred by his failure to settle the estate within the time limited.